Good morning, Your Honor. May it please the Court. I'd like to reserve a couple of minutes for rebuttal, if I may. And your name for the record, please. John Conley, on behalf of Sylvia Mondero, Your Honor. Thank you. Among other things, appellant contends in this case that the district court erred in determining that no direct evidence of discrimination exists. In 1999, Sylvia Mondero was denied the opportunity to participate in a loan program, an operations journeyman loan program, at SRP's fault-locating department. At the time, four similarly-situated males were participating in that loan program. You say at the time. There was a time lapse here, wasn't there, when the men got the job? It was months later that she asked. In about November 1998, Your Honor, SRP came to these men who were working in a different department and said, we're going to be laying you off shortly here because we're downsizing. How about we give you a chance to retain your journeyman's position with SRP by moving over to this different section where we're shorthanded? And they actually went to five men at that particular time. Sylvia Mondero was told around that same time that she was going to be laid off imminently, but she was not offered that same opportunity in 1998 either. But at this point I'm focusing on what happened while the loan program was actually going on in 1999. And what happened was while these gentlemen were going through this loan program, one of them, a gentleman by the name of Chester Atkison, heard two of the working foremen who were responsible for supervising the operations journeyman trainees say specifically about Ms. Mondero attempting to come over into fault locating what? They're going to bring a woman in to do a man's job. That's a direct quote. Judge Martone said these were just straight comments. He didn't show that they influenced the discontinuation of the program. Yes, Your Honor. Well, what Judge Martone said in his order was that Chester Atkison's comment, or actually I believe it was Pat Clampett's comment, that those two gentlemen were really macho-type people and that they didn't like women was a straight comment. I disagree with that. But there was also the additional comment of, with respect to Ms. Mondero coming to work for them in fault locating, at this time, what? They bring a woman in to do a man's job. Judge Martone did not address that comment in his order. And that, we argue, is direct evidence of discrimination. How do you link the person who said that to the decision to discontinue the program? During the discovery process of this case, I deposed Roger Herliman, who was SRP's kind of first-line manager over at the fault locating department. He was in charge of fault locating at the time. And the supervisor of Tom Milney and a gentleman by the name of Utter, who were two of the working form and the two who made the discriminatory remark. During his deposition, he admitted that while they were trying to hash out how this loan program was going to work, he consulted with them and sought their input into it. Then at the close of the program, when Ms. Mondero was trying to come in, if you look at SRP's position statement to the EEOC, it might even be in their supplemental position statement to the EEOC, which is in the record, they specifically say, we decided after consulting with the working foreman not to continue the program. Those working foreman and Roger Herliman and Kevin Nielsen, who was Roger Herliman's boss, got together and decided to discontinue this program and effectively keep Ms. Mondero from participating. I've got the letter where it talks about the working foreman, but I don't see these guys mentioned by name. It talks about working foreman. I mean, how do we know that that's Milney and Utter? Well, Milney, it doesn't exclude Milney and Utter as the working foreman, Your Honor, and I think that raises an issue of fact. How many working foreman were there? I believe there were perhaps four or five. There's not many. There was only about ten operations journeymen, I believe, at the time in the whole place. There might have only been one more working foreman, but I know that it's not a large number, Your Honor. It's less than five, I would imagine. I'm sure that SRP's representative can tell us. But it is clear that those two who made discriminatory remarks were involved in the decision to discontinue this program and keep Ms. Mondero from participating. How many times were they overheard to say these remarks? Was it just one time? Well, that particular remark was overheard by Chester Atkinson, but Mr. Atkinson also testified that he heard these same people expressing that they did not want a woman coming to fault locating. He also expressed that, in his opinion, a woman coming at the fault locating at that time would have or Ms. Mondero, he didn't say a woman, Ms. Mondero coming at the fault locating at that time to work for these gentlemen, she would have been coming into a, quote, hornet's nest. Another gentleman has said that these two were really macho-type people. Another gentleman has said that bringing a woman into fault locating was totally against what they believe in. Again, another quote. There's considerable direct evidence of discriminatory animus because there is no need to infer any gender bias in those comments. There's no need to try and presume that there's any gender bias in those comments. Those comments, we don't want a woman working here. In fact, we don't want Sylvie working here because she's a woman, are clearly discriminatory on their face. The next step, then, becomes can we tie it? Is there a sufficient nexus to the decision makers, the ultimate decision makers? And the answer to that is yes, because the ultimate decision makers have admitted, and SRP has admitted to the EEOC, that it was a collaboration of Roger Hurlem and Kevin Nielsen and the working foreman to decide whether to begin this program and whether to end this program. You argued earlier that they sought the input of these working foremen. What does the record show that that input was from the working foreman to the supervisors who made the decision to kill the program? Your Honor, if you read their supplemental position statement, not only did they tell the EEOC that they sought the input, but they also attached statements from these working foremen, the same ones that made these discriminatory comments, to their supplemental EEOC position statement saying, we didn't think the program was working out, we didn't think that these gentlemen were. And those statements are business reasons. Well, that's what they say, Your Honor. Well, they are. Well, those are proffered business reasons, but they're proffered business reasons by the same people who have also spoken. But my question was, the discriminatory statements that you've referred to, is there anything in the record that those were relayed to the supervisors and that the supervisors then adopted them? There are no admissions by SRP that Roger Hurlman and Kevin Nielsen adopted those statements. However, in reading the body of law in this area, I don't recall seeing any other discussion about whether or not, like, for example, in the ODIMA case or from your circuit, Your Honor, in the Wells case, I don't recall reading any case where there was evidence that the ultimate decision-maker adopted the discriminatory comments of the lower level. Well, if the ultimate decision-maker has a good business reason to take an action, isn't that all we can look at? No, Your Honor, because I've been – that's made by one or two foremen? If we're talking about a straight comment, no, Your Honor, because a straight comment is something that we're not going to find in this case. This was not just a general in-passing comment. This was about Sylvia Mondero and about that job. You see the struggle I'm having. You're saying that you should go to trial on this because of what the foreman said. And I'm having trouble seeing that what the foreman said was relayed to the supervisor, and the supervisor's decision was then a pretextual decision. Your Honor, as this court found in the Godwin decision and its Godwin decision, to what degree the discriminatory comments of gentlemen like Milne and Utter influenced the ultimate decision-maker is an issue of fact. That's a direct holding of your Godwin decision. I'm having trouble seeing in the record that it was ever communicated to the supervisor. And we're probably never going to have a case where we see in the record that it was communicated to the discriminatory supervisor. What we have, Your Honor, is we have the two supervisors who made the decision, and SRP admitting that they relied on these people to make this decision, and these people showing direct discriminatory animus. That raises, as the Godwin court stated, and as O'Deema has stated and as Well stated, that raises an issue of fact for the jury to decide. You're absolutely right. To what degree were these people in collusion? And we don't know that. I don't know that we're ever going to have a case where we know that, unless SRP, unless Roger Hurlman or one of the other SRP managers admits. But at that point, then we're not talking about the two lower-level supervisors. At that point, we'd have direct discriminatory animus from the upper-level supervisors. Thank you very much, Mr. Connolly. May it please the Court, my name is John Egbert, and I represent SRP. Let me start off by talking about the direct evidence in this case, and then just briefly talk about the indirect. In this situation, plaintiffs argued, relied exclusively in the trial court, and then in their opening brief, they relied only on the testimony of Roger Hurlman from the deposition. And in that testimony by Mr. Hurlman, he clearly, and we pointed this out in our answering brief, we pointed out that in that testimony, he made it very clear that this was prior to Mrs. Mondaro ever coming on the scene. This was back when they were deciding whether to start the program at the beginning. And he testified that they did consult the people who were going to be doing the supervising, these foremen, and asked whether they thought it was even workable. And they said they Mr. Connolly asked Mr. Hurlman, well, what did they say? What were their concerns? And their concern was, in the deposition cited by plaintiff, they were concerned as to whether or not these facility services electricians would have the background, would have the ability to work with these higher voltages of electricity. That was all. There was no connection between them and the later decision as to whether to repeat this program for Mrs. Mondaro after she was laid off. Well, in their reply brief for the first time now, they cite this EEOC statement by SRP. And it's very important, if we are going to consider that at all, having been raised in the reply brief for the first time, this is Excerpt of Record 7, Exhibit 9, Page 3. This is what they're citing. It says that during the training early in 1999, they consulted with the working foremen. And the working foremen said, well, how is the program going? And they asked the working foremen that. And the working foremen said, well, it's going pretty well. And they submitted these reports, and they expressed their concerns. And that's the input that these supervisors relied on when they later determined whether or not they're going to repeat the program. There's no evidence at all in the record, even if we look at this EEOC statement, that there was any input about Ms. Mondaro, about women working in the department, about anything. And there's no evidence in the record. Your argument is it's more subtle than that. What they're saying is these two guys don't want women there. And when asked how the program was going, they said it's not going well. And that was communicated to the boss who made the decision, concealing their real reason, which is they don't want women there. Your Honor, if you look at the reports, they didn't say it's not going well. The reports, in fact, that's part of the argument that they made, was that the reports said, gee, you know, these guys, these facility services men that we're now supervising, they're doing an adequate job. They're doing whatever we ask them to do. Did the decision makers get input from these foremen? They got input about how the facility services electricians were doing in the training program. And they say that the people who gave the input don't like women working on the job. That's right. And so why isn't that enough to get them over summary judgment? There's no linkage there, Your Honor. It's like saying that what if they had given input as to the equipment that was being used for the training program, that it was inadequate. There's got to be some linkage that would give a reason. It's got to be a genuine issue. It just can't be some fact that they had a conversation about the weather or about the equipment or about how the facility services people were doing. There has to be some indication that this attitude or even these comments that were made by two of these six working foremen were somehow negative or somehow would have gotten to the decision makers so that it could have possibly influenced them. This record is devoid of anything like that. There's no genuine issue that there's any type of that influence in the decision maker that reached the decision maker that could have possibly influenced it. That's not direct evidence. They haven't presented any direct evidence here. This is Judge Martone got it right. These are stray remarks by people that were not involved in the decision. They gave input to the decision makers, but they gave input not about, gee, should we do the program again for Ms. Mondaro? Nobody ever asked them. They don't even allege that was asked of these working foremen. What do we know that they did say about it? All we know is that they talked about how these original four that came into the program, they gave just kind of performance reviews. They said it was okay? They said it was fine. They weren't glowing comments. They said here's some areas that need to improve, but basically they gave fairly positive input about these four working foremen. Otherwise, they would not have become operations journeymen at the conclusion of the program. Now, with respect to the indirect evidence, what plaintiff does here is select six statements that she says are out of these EEOC position statements and then tries to create issues of fact as to those six statements. The reality is that three of them aren't even in the EEOC position statements submitted by SRP. They're just not there. And we said that in our answering brief. We said these three aren't even in there. We never said that to the EEOC or anyone else. We never relied on those at all. And in the reply brief, they don't contradict us. Those three statements just briefly are plaintiff did not possess the background, training and experience. We never said that. We never said that's the reason why we didn't repeat the program for her. The second one they allege in their brief, their opening brief, SRP didn't need any more operations journeymen. Again, we never said that. It's not in the EEOC position statements that we submitted. Where did that come from? I don't know, Your Honor. They do say, they do then later talk about some language that doesn't say that in the EEOC position statement. It does talk, we did talk about how we, in the summer months, it's undisputed that this particular fault locating department, their workload goes crazy. It peaks. And so they're borrowing from every department they can find. They're hiring temporary employees in order to fill the load. But the undisputed evidence is that by August, that load is starting to drop off and they're starting to shed all these extra employees that they have. And so there is some discussion in the EEOC statement that says, you know, by the time Sylvia is now requesting, you know, after we're done evaluating this program with the original four and deciding whether we're going to repeat it, she's now wanting to come in when we're, you know, at the, in the shedding portion of the cycle. We're starting to get rid of these employees. And so that's, I think, the little piece of kernel of truth that then gets changed into this allegation that we said we didn't need any more operations journeymen and we did not. The third one that we never said is that the loan program was unsuccessful and that it just wasn't cost effective. Those are just straw men that are built up and then knocked over and they don't create genuine issues. They don't create substantial, circumstantial or indirect evidence, which is the standard that they need to satisfy. The remaining three, briefly, the first one is that the electricians from the facility services department obtained permanent positions through competitive bids. They say there's an issue of fact as to whether or not at the conclusion of the program they actually were handed jobs or whether they had to go through the normal competitive bid process. Well, who cares? That's not a genuine issue of material fact as to why we didn't offer her the same opportunity. That has nothing to do with, you know, you could go either direction and it doesn't, it's not a genuine issue of material fact. So the second one, Ms. Mondaro agreed to work in fault locating in June, which is the start of the peak season. Fault locating simply did not have the manpower available at this time of year to dedicate extensive training to Ms. Mondaro. Well, they say, again, that is a statement that we did make in our position statement, but we never said that was the reason why we decided not to repeat the program. Our reason for not repeating the program has consistently been, one, the better way to do this was simply the apprenticeship program, and two, while these facility services electricians were in the program, they were being paid at journeyman's rate even though they weren't really doing journeyman level work. And the nice thing about the apprenticeship program is that it cures that because an apprentice, when you're going through the program, you get increases in your salary so that by the end of the program, you're finally making journeyman's wages. But that's the only way you could do that under the collective bargaining agreement that SRP had with its hourly employees. And so those were the two reasons that we've always given, and we've never varied from that. The final, the sixth reason that they offer as some sort of inconsistent statement was plaintiffs would have been included in the program if she were available in December of 1998 or January of 1999. This is, again, it's not we never did claim that we decided not to repeat the program for her in August of 1999 because she wasn't available to go into the program originally. Those two things are, I mean, they don't even meet. They're like ships passing in the night. We ask the court to affirm the summary judgment. Thank you. Mr. Connolly, we'll give you about a minute in rebuttal. Your Honor, this court hit the nail right on the head when it asked my colleague, well, what did the two foremen talk to the SRP managers about? And his response was, well, they just talked about how the program was going okay, but it wasn't going well enough. We don't know that, Your Honor. Judge Martone doesn't know that. Until a jury looks into the eyes of Milne and Utter and sees their facial expressions and sees their body language and determines whether or not they're telling the truth about what they, in fact, spoke to, spoke with Mr. Hurlman about, we aren't going to know the answer to that question unless we just accept SRP's proffered nondiscriminatory reason, without even looking at the myriad evidence in Ms. Mondaro's favor which refutes it. For example, how can SRP in one breath say that Milne and Utter simply conveyed to Roger Hurlman that the program was going fine and these gentlemen were doing okay and that's evidenced by the fact that they eventually got jobs and became operations journeymen, and then in the same breath say that SRP went to these foremen to determine whether or not the program was working and they said, no, shut it down. Completely contradictory. If it was working, if these gentlemen, if these four gentlemen who became foremen were doing so well, why did they shut the program down just as Ms. Mondaro was trying to get in? It's because of the discriminatory animation, Your Honor. Thank you very much. Thank you. Well, thanks to both gentlemen. The case just argued is submitted. We will stand in recess for the morning. Thank you. Thank you. Thank you. Thank you.
judges: Alarcon, Siler , Silverman